183205 Milwaukee Center for Independence v. Milwaukee Health Care And it's Mr. Kramer, is it? Yes, ma'am. Hi, Mr. Kramer. Good morning. Good morning. May it please the court. The case in front of you is a clever, extraordinary, and wrong attempt to turn a run-of-the-mill breach of contract into a tort, and a tort based on a crime at that, against a man who didn't even take the actions at issue. The district court's decision incorrectly blurs the distinctions between contract and tort, and invades the principle of limited liability that's essential to the LLC form. We're asking you to reverse the district court's summary judgment ruling for three independent reasons. The first is that while this may have been a breach of contract by Milwaukee Health Care, and it plainly was a breach of contract, it was not a tort. The second point is that even if it was a tort, the appellant, Bill Nicholson, didn't do it and can't be held personally liable because he didn't take these actions. And the third point is even if you get far enough down that road, MCFI, the appellee in this case, did not establish any damages specific to Mr. Nicholson. I'd like to start to drill down on the first point, which I think is sort of the keystone to all of this, which is that this is only a breach of contract and it's not a tort, and that's for three additional reasons. First, there was no property interest that MCFI had in the money that they're claiming here. Under the terms of the contract, Milwaukee Health Care owned the money and MCFI could only be paid on an invoice. The second point is related, which is that there can't be a property interest because the money was not specifically identifiable enough to amount to a convertible type of thing. Now, in Methodist Manor of Waukesha v. Martin, the funds were in a joint bank account where they could be commingled with other funds, yet the court still found a potential claim for conversion because the amount owed to Methodist Manor was readily identifiable. And Methodist Manor's entitlement to those funds was established in the contract. Isn't that similar to this case? I mean, why should the movement of the money between accounts matter when the source and amount of it is established and the entitlement to it is set forth in the contract? In the Methodist Manor of Waukesha v. Martin case, the Methodist Manor 1 case, Methodist Manor had a statutory right to all money except for $45 that came in to the mother, who was the person who was the patient at the Methodist Manor. In this case, MCFI only had a right to be paid on an invoice, and the second point is that those were specific identifiable funds. They came in from Social Security. Everything except for $45 was earmarked specifically by statute for the care provider, and the patient could only take $45 off the top. And the third point is that the claim in Methodist Manor v. Martin was against the son, who wasn't a party to the contract. And in this case, MCFI's claims are completely duplicative of a breach of contract. If you look, there's a second Methodist Manor case, so I called it Methodist Manor 1. Methodist Manor 2 is Methodist Manor v. Pye, and that very same court that issued the opinion in Methodist Manor v. Martin distinguished that case and found there was no conversion when there was a granddaughter who was acting on behalf of the patient and withdrew funds at that patient's request, or the patient's use. Look, the path that the funds took arriving back in Milwaukee Health Care's hands isn't determinative of whether MCFI had a property interest in the funds. All it seems to me that matters is that, as the district court held, MCFI was supposed to receive on the 20th of every month a specifically identified share of specific revenues that the parties in their agreement identified by name and agreed would be kept in a specific account. That's sufficient for a property interest to arise, and it's very analogous to the facts in Methodist Manor of Waukesha, it seems to me. There are a number of contractual provisions that establish from the gate, out of the gate, that Milwaukee Health Care was the owner of all funds that were coming in. They billed in their own name. So if you looked at the contract, which is in the record at Document 68-3, there's Section 8A that the facility, meaning Milwaukee Health Care, performs all billing, accounts receivable, and collection functions in its own name, and the facility will collect in its own name on its own behalf. Section 8B establishes only that MCFI will invoice the facility for those costs incurred during the month. The contract also contemplates that those portions of those invoices might not be paid immediately and would have to be paid at a later date. Subsection 8C is the contract provision that sets up this account, but it's not an account that MCFI ever had any right to anything except to be paid out of that account. It's an administrative account. Well, what could be more important than that? Well, that's a contract right. MCFI had a property interest in the funds, and if those funds were diverted for other purposes, it seems to me that would constitute conversion and presumably civil theft as well. A right to be paid on a contract does not establish a property interest, and the contract itself set forth that Milwaukee Health Care owned these funds until the point that they actually paid invoices. Furthermore, MCFI knew that Milwaukee Health Care owned those funds. If you were to look to Section 2J of the contract that we've been talking about, it asked Milwaukee Health Care to seek approval from HUD and the mortgage lender to allow Milwaukee Health Care to grant a security interest in incoming funds related to the brain injury unit to the Milwaukee Center for Independence. Now, that acknowledges that Milwaukee Health Care owns those funds because you cannot grant a security interest in something that you don't own. Well, the funds that you're describing come from different sources, don't they? You mentioned two. I mean, some government payments, and I don't know about patient payments. And does everything go into one fund initially and then is redistributed? So if you're talking about Milwaukee Health Care's all incoming funds. Yeah, because I assume it comes into one account. I don't know that. I'm kind of asking you, what is the fund? Where does it accumulate initially? Because you have some government payments, right? Right. There are government payments that go into a government payer lockbox, and there are third-party payments that would be from either independent insurance or from patients themselves that would go into its own separate lockbox. So you've got two accounts then. Two accounts, two lockbox accounts that are swept on a daily basis. They're commingled. All funds coming into Milwaukee Health Care are all commingled into one of those two accounts. They are then swept up, commingled, and applied against the balance of an outstanding loan that is due to the account's receivable lender. All that money is then gone. It's not identifiable because it's gone. It's been applied against an outstanding loan balance. What Milwaukee Health Care then gets back is a new advance of loan funds. It's new loan funds, and the new loan funds are based on new future receivables. So that's the borrowing base. They can borrow against new future receivables. The debt keeps growing. The debt keeps growing. That's part of the problem. That's part of the problem, absolutely. And they're limited to an amount in new funds that's based on outstanding accounts. That means that all money that comes to Milwaukee Health Care to pay any bill that they have is a new loan fund, and it's one lump sum. It's not set aside in any particular way. And it had to go to rent. It had to go to payroll. It had to go to vital vendors to keep the facility open. And unfortunately, at the end of all of that, there was no money to pay MCFI. And that's plainly a breach of contract, and we admit that. But those new funds, it wasn't like they said, we're just going to not pay MCFIs. They just ran out of money, and the money didn't go to the Berk receivable account that's set up in the contract. That itself is a breach of contract. But MCFI had no entitlement to that money. They could not access the account. They could not access the receivable account. They only had a right under the contract to be able to view a statement on a monthly basis. That's the only right they had to it. Plus, they weren't entitled to the entire amount that was in that account at any particular time. They were only entitled to at maximum the amount in an invoice. Milwaukee Health Care was also entitled to be paid some portion out of that same account. So it's not like MCFI had a right to the entirety of the account either. They only had a right to be paid on invoices. When I look at a connection between that and the nursing home, for example, for the brain injury center, that's Berk or whatever it is, and MCFI operated that, I guess. I'm not sure of that sequence. They must have a payroll too. They must have other demands every month or week, I guess. And I don't know how they're at the end of the line where everybody else spends all the money and so there's none left. That seems to be what happens here. I think that's accurate, but it was a contractually negotiated obligation, and that's what it boiled down to is they set it up like this, and they had contract rights. They could have asked for specific performance. So they had to keep working in other ways even though they weren't getting paid, I guess, is the way I look at it. MCFI. Sure, but they did have rights under the contract, and they could have asked for, like I said, specific performance. They could have asked for an accounting of the account. They didn't do any of those things, but that's where their remedy lies is a contract. And the point of all of this is that this is what Milwaukee Health Care was doing, and it is far removed from anything that the managing member of Milwaukee Health Care was doing. The managing member of Milwaukee Health Care is an individual. He appointed a person to act as a CFO to take actions on behalf of Milwaukee Health Care. That person took those actions, and Mr. Nicholson, the appellant, was not involved except at a high level as the sort of boss of that person. And what essentially has happened here is that this— According to the district court, you forfeited that argument. That's—I'm getting close to my reserve point, but I would like to address that. In order to waive that argument, it would have to be an intentional waiver of that argument, and it would require that it was—that would be an issue of fact that we were waiving. So that would be something akin to a judicial admission. In this case— That's a new argument for me, but go ahead. It's in our briefs, but what we discussed then is it has to be akin to a judicial admission in the sense that it has to be something that's factual, and it has to be an intentional waiver of that argument. In this case, we argued all over the place that there was no personal liability, and then to then just sort of throw up your hands and say that there's an agency argument, I think, flies in the face of that, and it clearly wasn't an intentional waiver of— Things are waived unintentionally every Monday and Friday. Sure. I'm down to two minutes. I'd like to reserve a bottle, but thank you. Okay. Thank you. All right. Mr. Trigg. Good morning, Your Honors, and may it please the Court. Stephen Trigg on behalf of the Milwaukee Center for Independence. Today, I would like to divide my presentation into three parts. Each of which explains why the District Court's decisions should be affirmed. First, the District Court properly followed controlling Wisconsin law on the torches that arise from misusing funds. Second, the District Court properly followed Wisconsin and Delaware law on Nicholson's personal liability for the actions of his right-hand man, Eb Tabor. And third, many of the arguments raised by Nicholson before his court were waived, and they should not be the basis for overturning the District Court's decisions. Say that third again. Many of the arguments that Nicholson makes before his court were waived before the District Court, and they should not be the basis for overturning the District Court's decisions. Okay. Starting with the Wisconsin law— I thought points two and three were pretty much the same. Am I wrong? He's made some specific arguments with regards to— Tabor. Tabor and with regards to the property interests that we believe weren't made to the District Court. Right. And to those extent they were made, we argue they were waived. Okay, so two and three. It's all about waiver. Correct. All right. Turning to the Wisconsin law on the torts of conversion and civil theft, the District Court properly held that MCFI had sufficient property interests in its portion of the collections to support the tort claims. This issue is decided entirely by Wisconsin controlling the law. The District Court's decision is fully supported by that law. For over 150 years, the standard has been whether the plaintiff can identify the funds that the defendant received— show that the defendant received the plaintiff's funds and used them. The test in Wisconsin is not whether the plaintiff kept the defendant's funds separate and apart from any other funds. This is the commingling argument. The test is also not whether the plaintiff can trace an intact fund and show that the defendant still has possession of that particular money, as in some contexts. The District Court noted that sufficient property interests exist where the funds have been or should have been segregated for a particular purpose. Here, money from solvent third-party payers flowed into Milwaukee Health. The parties agreed that it would then be deposited into a specific segregated bank account, and on the 20th of each month, MCFI was entitled to possess its portion of those collections. Under the agreements, was MCFI's entitlement to the funds conditional in that it was subject to the whim of any accounts receivable lender? No, Your Honor. No. The parties agreed on a very specific flow of funds in the agreement, which is that it would come in to Milwaukee Health and then be deposited into the segregated account. About a year later, after the parties had already started performing, and the parties entered into a restated agreement, they entered into that accounts receivable lending relationship and created these lockboxes and the sweeps of accounts that Nicholson bases his arguments on. His arguments with regards to the accounts receivable lender assume that this commingling and the tracing conditions apply, and our argument is simply that Wisconsin law does not impose those conditions for the torts of conversion and civil theft. Since at least 1861, Wisconsin has generally recognized that you can convert the intangible right to money. It doesn't impose these restrictive conditions that he argues for. You can see this in decisions in Methis Manor and Regas v. Helios. It was sufficient that the plaintiff could identify the funds the defendant received, and he had prevented the plaintiff from having possession of those funds. Here, those funds are definitely sufficiently identifiable. These are multi-hundred-thousand-dollar transactions with very careful accounting, and Milwaukee Health tracked and identified at all times the source of those funds. It knew to the penny where the money came from, the patients it was for, and how much was to be deposited and transferred to MCFI. The district court decision properly applied Wisconsin law because there's simply no commingling or tracing requirements at issue. No commingling or tracing what? Nicholson made the arguments in his brief that because funds were commingled together in the bank account, we can't recover on conversion or civil theft. Now, Regas v. Helios and Conbee-Sharpstein specifically say that's irrelevant. The fact that you took the money and then commingled it with other money does not defeat the claims for conversion or civil theft. Similarly, in Methis Manor, there was no hint that the money had to be kept separate and apart from other money at all times to support the claims. Nicholson's arguments rely with respect to Wisconsin cases. He cites one 1996 Eastern District of Wisconsin case that tried to apply Wisconsin law, but it held that in order for there to be a tort claim with regard to the intangible right to money, there had to be a specific identifiable amount of currency or another tangible object to attach that right to. That's simply not the law in Wisconsin. The plaintiff does not need to identify a specific and identifiable amount of currency. Neither Methis Manor or Regas v. Helios apply this approach. He also relies on a 1989 decision regarding borrow receipts and whether or not those were deposited into a bank account. This is a TWS v. Nelson decision. There's a bare reference to unsegregated funds and a footnote in that case, but that case is very different facts. The defendant didn't track at all the amounts of money that were received, and there was no way to identify exactly what had been received. Furthermore, it was decided before Methis Manor and makes no mention of Regas v. Helios. Here, we have very carefully detailed accounting of where the funds came from and how they were supposed to be divided between the parties. Nicholson's arguments regarding the accounts for the receivable lender are a red herring. His arguments assume that the co-mingling and tracing conditions he advocates for apply. It's undisputed that Mohawk Health received MCFI's funds, portion of the collections. Received what funds? Received MCFI's portions of the collections. Unspecified portion, you said? What's the adjective you're using, the funds? Received MCFI's portion of the collections. Are you saying unspecified? No, received MCFI's portion of the collections. Unsupervised? I'm not getting that. He received MCFI's portion of the collections. Oh, MC. MCFI, I'm using the acronym. Oh, are you lucky, Judges, Regas is here. Never use an acronym. Not particularly when he's here. When he's here. How about that hint, huh? Go ahead. So it's undisputed that the amount collected was tracked and identified at all times and that's sufficient for MCFI's claims. Turning to the second issue, the District Court properly followed Wisconsin and Delaware law regarding Nicholson's liability for the actions of Ed Tabor. It's black letter law. The corporate liability shield does not protect individuals from their own participation in tortious acts. You know, setting aside the forfeiture issue for one moment, okay, what evidence is there in the record to indicate that Tabor was acting as Nicholson's agent rather than an agent of Milwaukee Health Care? Well, I think in that aspect, I think it's important to look at the context of the relationship between Nicholson and Tabor. The two worked together in Massachusetts where Nicholson has invested in a slew of companies and Tabor there is his right-hand man overseeing those investments. So Nicholson, as shown in the record, Nicholson expected Tabor to follow his instructions. Tabor had Nicholson's best interests in mind when taking actions on Nicholson's behalf at Milwaukee Health and he was acting on Nicholson's behalf as the owner when misusing funds. Tabor was in charge of Nicholson's personal funds and could draw on them as needed. He did this and used those personal funds to help keep Milwaukee Health afloat for some time. He would take funds from other investments and infuse them into Milwaukee Health to pay employees or to cover the mortgage payment by the property owner. But in 2015, Tabor stopped using Nicholson's personal funds to cover these lease payments. And to cover that hole in the finances, the solution was to use MCFI's portion of the collections to cover those expenses. At this point, Tabor was looking out for his principal, which was Nicholson. He protected Nicholson's personal resources by using MCFI's funds. And this aspect was to the detriment of both MCFI and also to the detriment of Milwaukee Health because by doing so, it made Milwaukee Health liable on the contract with MCFI. Was Nicholson loaning this money when they're taking from his account? Or is that an investment, or is that a gift, or what is it? The way it was set up is that the money would be accumulated and then it would be provided to, to avoid another acronym, the entity that owned the building that housed the nursing home. That entity would then, he would loan it to that entity. That entity would then transfer the money down to the nursing home entity. So there's a property company and an operating company. And there is a loan. It was referred to as a surplus cash note. He says these show how much he put into the entities at various times. They were actually, they're not part of the record, they weren't produced in discovery, but he claims they show that they were loans that could only be repaid in certain instances. So based on, based on this record, before the district court, MCFI argued, Nicholson conceded, and the district court found that Tabor was Nicholson's agent and Nicholson was personally liable for his actions. Now importantly, MCFI provided multiple different legal theories why Nicholson was liable for Tabor's actions. In its opening brief, it's at document number 67, pages 22 to 24. In response, Nicholson's response was very clear. Defendants do not disagree with plaintiff's analysis of the general law regarding principal-agent relationships, citing those exact pages. And defendants concede that Nicholson was principal and Tabor was Nicholson's agent. So he wasn't seeing merely that Tabor was agent and Nicholson was principal. He was seeing the larger argument that he would be personally liable for these actions. The district court appropriately relied on this concession, and as the court mentioned earlier this morning, parties are free to concede theories and arguments in their briefs at any time, and the parties and the court are entitled to rely on those concessions. During the liability phase, Nicholson tried to change gears. During the damages phase, he tried to change gears slightly. He admitted again that Tabor was his agent, but not only as a managing member of Milwaukee Health, not personally. He argued that he was therefore not personally liable because of the corporate liability shield. But this argument brought up a little distinction between Wisconsin law and Delaware law. And Delaware law is relevant to this one issue because Wisconsin has a statutory choice of law provision that says that the extent of the corporate liability for foreign LLCs is determined by the state of organization. Here, from Milwaukee Health, it's Delaware. Under Delaware law, even if a Tabor was acting on behalf of Nicholson as the managing member, he's still personally liable. And in this instance, Delaware is less protective than Wisconsin. Nicholson has brought up yet a third relationship with Tabor before this court. But this contradicts his prior arguments, it's not supported by the record, and his attempts to change positions at this late date should be rejected. Therefore, we ask that the district court properly held that Nicholson was liable for these actions, and that decision should be upheld. Now, in response with regards to the general waiver argument, unless the court has any specific questions, I would refer to the pages in our brief, 29 to 32 of the appellate brief, which lays out the arguments Nicholson made, the arguments he didn't make, and why those arguments have been waived. Well, just one follow-up a little bit where you said he changed position. What's the before and after? The first position was simply Tabor was agent, Nicholson was principal. That was the position at the liability phase. During damages phase, it was Tabor was agent of Nicholson, but only in his role as managing member of Milwaukee Health Care. His current argument is that Tabor is not Nicholson's agent at all. Instead, they are both co-agents of Milwaukee Health, and Nicholson is not Tabor's principal. Thank you very much. Mr. Kramer, how much time? Okay. Two minutes for rebuttal. The first point I'd like to make in rebuttal is that in the contract, MCFI, the appellee, consented to the possibility that there would be an accounts receivable lender, and in doing so, accounts receivable lending is a common practice in the health care industry. In doing so, they consented to what is almost always a lockbox sweep applied against loans and then a new advance of funds, so they consented to that. The second point that I'd like to make is that you asked what evidence there was that Tabor was acting on behalf of Nicholson. There is none. The evidence is that Tabor was making payment priority decisions on behalf of Milwaukee Health Care. He was doing that in conjunction with Grace Health Care, a third-party professional manager who actually made the payment decision. Grace is a party to both of the contracts between Milwaukee Health and MCFI, and Grace only had a contract with Milwaukee Health Care, so Tabor's authority derived only from his role with Milwaukee Health Care, and he had no authority to act on Nicholson's personal behalf, and, in fact, every action he took was on behalf of Milwaukee Health Care and not on Nicholson's personal behalf. The last point I'd like to make is even if you get all the way down that road, what the district court found was that Tabor was Nicholson's agent in addition to acting on behalf of Milwaukee Health Care, and in doing so, that would make Tabor a double agent. If Tabor is a double agent, then in order to assess damages, you must figure out who that double agent is actually acting on behalf of when they damage someone, and in this case, it's abundantly clear that Tabor was acting on behalf of Milwaukee Health Care, paying Milwaukee Health Care's bills when he took the actions that are at issue here. My last point is that if Delaware law is applying, Delaware prohibits derivative tort claims, which would say you as a member of this company interfered with a contract, you as a representative of the company interfered with this contract, so it's the Carota case, and I'm out of time, but if you take a look at the Carota case, there's a discussion of what derivative tort claims and what you cannot do when there's a contract at issue. Thank you. Thank you very much. Thank you very much. Thank you, Mr. Kramer. Thank you, Mr. Trigg. The case will be taken under advisement.